MYERS v. HARDIN, ADMINISTRATOR.

4-7586                                              186 S. W. 2d 925

Opinion delivered April 16, 1945.

506

*I. S. Simmons, D. L. Grace, Hill, Fitzhugh & Brizzo-lara, Roger S. Miller* and *Rogers & Rogers,* for appellant.

*D. L. Ford* and *Hardin, Barton & Shaw,* for appellee.

*Clinton R. Barry, amicus curiae.*

HOLT, J. Mrs. Celia Elmira (Reeves) Hickey died testate on or about November 28, 1942. Her will was dated December 13, 1938. The present suit was instituted in equity by G. C. Hardin, Administrator, with the will annexed, seeking construction of the will and proper directions as to the distribution of the estate. To this complaint and amendment thereto, a demurrer, separate answers and a reply of certain interested parties were filed.

The will, which was made a part of the complaint, omitting formal parts, after directing payment of all just debts and funeral expenses, in paragraph "Third" made certain specific bequests of jewelry, furniture, a car and musical instruments, and in paragraph "Fourth" she gives, devises and bequeaths the remainder of her estate, both personal and real, to Charles H. Lamb, as trustee, to possess, manage, control, invest and reinvest "in such manner as to said trustee may seem best. Except as hereinafter expressly limited, said trustee may hold and retain securities or other property, representing investments as that in which they may exist at the time of my death, whether or not the same may be permissible by law as investments for trust funds, or said trustee may change any such investments when in his judgment the market is favorable therefor. I hereby give and grant unto my said trustee full power and authority to exercise its discretion in the management of said estate, except as herein limited including the right to sell, convey, partition, lease, pledge, mortgage, hypothecate, partition, or subdivide any of the trust estate, and in all other respects, it generally may handle, manage, operate and dispose of the whole or any portion of the estate in such securities, properties, or manner, and upon such terms and conditions as I might or could do if living, or which trustee may deem most advisable. . . ."

Then in subdivisions "One" and "Two" following, she makes bequests to a sister, Ellen Williams, a half brother, John Cassler, and to the Catholic Cemetery, and "Three: From the remainder of the net corpus of said trust estate after the payment of the said one thousand dollars to Ellen Williams, and one thousand to John Cassler, my brother, said trustee shall pay and deliver in cash or its equivalent in securities at their then market value as said trustee in its discretion shall elect, the following sums and amounts, providing, however, that if said net trust estate is not adequate to pay all the following sums and amounts, in full, the net amount available for payment of same shall be paid and delivered probate (pro rata) as follows:" Then follow sixteen specific bequests in money (a to q incl.). These sixteen bequests, together with the three named in paragraphs One and Two, supra, total $15,600. The will further provides: "In the event of the death of any of the beneficiaries, devisees or legatees in subdivision (a) to (q) both inclusive on page three and four of this my will, then such gifts, bequests, devise or legacy shall lapse, become and be a part of the residue of my estate, the residue and remainder, if any, of the net corpus of said trust estate above referred to, after the payment of the foregoing sums and amounts, shall go and be paid to my sisters and brothers; the survivor or survivors of them, share and share alike.

"a.1. In the event that previous distributions have not been sufficient to enable my trustee to have paid in full the sums and amounts directed to be paid to the persons and/or institutions mentioned in subdivision (a) to (q) both inclusive on page three and four of this my will, then as much of said trust fund, principal and income, as shall be necessary to pay said sums, and each of them, in full, shall be paid and delivered to them by said trustee. b.1. The net residue and remainder of said trust, and estate, shall be paid and delivered to my sisters, and brother, the survivor or survivors of them, share and share alike."

The "Fifth" paragraph provides in effect that the legatee, or legatees, under the will who shall seek to set the will aside, shall be cut off with the sum of $1.00 and the share of such contestant go to the other legatees mentioned in the will. In paragraph "Seventh" she appoints as her executor, Charles H. Lamb. It was conceded, however, that since Charles H. Lamb was a nonresident of Arkansas, he was not eligible to serve, and without objection, G. C. Hardin was duly appointed administrator.

Under an agreed statement of facts, it appears that the testatrix, Mrs. Hickey, was survived by one sister, Maggie Reeves Gates, and one half brother, John Cassler. John Cassler died during the pendency of this suit, leaving certain heirs who are parties to this action. Two of the testatrix's sisters and legatees under the will, *supra,* Ellen Williams and Anna Murphy, predeceased the testatrix.

There was found in a lockbox belonging to the testatrix in a Fort Smith bank, a large number of U. S. Government bonds of the total maturity value of approximately $23,100. Each of these bonds was issued as follows: "To Mrs. Cecelia Hickey payable on death to"— *a named beneficiary,* some of whom were legatees under the will, but a large number were not mentioned in the will. All of these bonds were purchased subsequent to the testatrix's will, except ten $1,000 bonds, which were purchased September 1, 1938, and were due September 1, 1948. In addition there were four Post Office certificates of the value of $500 each, issued to Mrs. Celia Hickey, found in the box. There was also found in said lockbox $5,300 in currency, some of which was separated in different envelopes with various names and addresses thereon. In addition there was found, in savings and checking accounts in Fort Smith banks, a total of $8,909.84. The total value of the estate was something over $39,000, consisting mostly of cash and securities, there being but a small amount of real estate involved.

Upon a trial, the court found, among other things, "that it was not the intention of the testatrix to create

a trust estate." The court further found "that it was the intention of the testatrix that the legacies appearing in said will and lettered "A" to "Q" in paragraph 3 thereof should be paid by the administrator to such of the beneficiaries named respectively therein as survived the testatrix; and the court finds that such of said recipients of the special bequests above mentioned as shall not have survived the testatrix, then and in that event such special legacy, in such instances, shall lapse, and that the same should be and become a part of the residual of the estate. . . . The court further finds that it was the intention of the deceased, as evidenced by the terms of her said will, that all of the rest and residue of her estate, after the payment of the special bequests theretofore set out therein, and after the payment of her debts and the expense of the administration, should be paid to such of her brothers and sisters as survived the said testatrix, and that in accordance therewith the rest and residue of said estate should be paid to the brothers and sisters surviving the deceased, and in the event of the death of one or more of said brothers and sisters subsequent to the death of the deceased, then and in that event his or her share should be paid to his or her heirs.

"The court further finds that among other assets left by the deceased at the time of her death there was considerable cash and a considerable amount in value of United States war bonds which were found by the administrator in a lockbox rented in the name of the deceased and held by her at the time of her death; that said moneys were segregated into various envelopes, and that there was written thereon the names of various ones of the relatives of the deceased, together with some appropriate notation evidencing that said money was to be delivered to the person named on said envelope at and after the death of the deceased; that said United States bonds were in varying amounts and were payable to the deceased and on her death to respective parties named in each of said bonds. The court finds that said money and said bonds were the property of the deceased in her lifetime and were in her exclusive possession and control up until the time of her death; that said bonds and money

then came into the hands of the administrator, and that none of the same has ever been in the possession or under the control or subject in any manner to the will or discretion of either of the parties named on said envelopes or on said bonds. The court finds that the designations above noted on said envelopes containing said sums of money and on said bonds did not in any manner operate to vest either of the respective parties with any rights, title, claim, or interest in or to any part of said property; that said bonds and money together with the other items of personal property found in said lockbox are all a part and parcel of the estate of the said deceased, and that the designations of the parties on said bonds and of the persons on said envelopes containing said sums of money were in aid of the distribution of deceased's estate under the terms of said will, and that same should be distributed to the recipients only in fulfillment of the respective bequests set out in said will." A decree was entered accordingly.

This appeal first challenges the jurisdiction of the trial court. Second, certain appellants contend that the trial court erred in holding that no trust was created and argue here, as they did below, that the trust which was created under the will is void "because it violated the rule against perpetuities; and that that portion of the trust property described as 'the rest, residue and remainder' passes as intestate property to the heirs at law," and third, that the court erred in holding that the U. S. Government bonds found in the lockbox, *supra,* of the testatrix, were "all a part and parcel of the estate of the said deceased . . . and that same should be distributed to the recipients only in fulfillment of the respective bequests set out in said will." We consider these alleged errors in the order named.

1. On the question of jurisdiction, we think little need be said in view of many holdings of this court to the effect that where a deceased attempts by will to create a trust, a court of equity has jurisdiction to determine whether such trust was created and to construe the terms of the will. In *Gaines* v. *Arkansas National Bank,*

170 Ark. 679, 280 S. W. 993, this court held: (Headnote 1) "When a trust is created by will, a court of equity, as incident to its jurisdiction over trusts, has jurisdiction to construe the will," and in *Booe* v. *Vinson,* 104 Ark. 439, 149 S. W. 524, this court said: "If, under the terms of the will, it be doubtful what the rights and duties of the trustee are, he can resort to equity for a proper construction and interpretation of the will, and certainly those interested under its terms in the proper definition and limitation of the trust and enforcement thereof may come to such court for like relief." See, also, the very recent case of *Jesseph* v. *Leveridge,* 205 Ark. 665, 170 S. W. 2d 71. We hold, therefore, that the court had jurisdiction.

2. On the second assignment, we find it unnecessary to decide whether a trust was in fact created by the will for the reason that even though a trust were created, it does not, as appellants argue, offend against the rule of perpetuities since the will, in question here, directs the trustee to make full distribution of the estate "as soon as possible," which means with due diligence and without unnecessary delay in the circumstances, and certainly within the lifetime of the trustee. In 4 Words and Phrases, Per. Ed., p. 328, it is said: "The words 'as soon as possible,' are usually construed to mean within such reasonable time as shall be required under all circumstances for doing the particular thing. . . . The words 'as soon as possible,' in a contract for the manufacture of certain specified goods, mean 'with all reasonable diligence' or 'without unreasonable delay,' *S. D. Childs & Co.* v. *Omaha Paraphernalia House,* 114 N. W. 941, 80 Neb. 673. The phrase 'as soon as possible,' which is equivalent to 'with as little delay as possible,' means within a reasonable time. . . . The phrase 'as soon as possible,' in a written contract for the delivery of certain bicycles 'by April 1st or as soon as possible,' had a definite legal meaning, and bound the vendor to fill the order within a reasonable time after April 1st if not then filled. *Williams* v. *Gridley,* 110 App. Div. 525, 96 N. Y. Supp. 978," and in *B. A. Collins & Company* v. *Gus Blass*

*Company,* 154 Ark. 244, 242 S. W. 70, this court said: "The words, 'at once,' are usually construed to mean within such reasonable time as shall be required under all the circumstances for doing the particular thing."

Under the terms of the will here, the testatrix vests in her brothers and sisters, the survivor or survivors, "share and share alike," determinable on her death, all the "remainder of said trust and estate." We think the principles of law announced in the case of *Miller* v. *Weston et al.,* 67 Colo. 534, 189 Pac. 610, apply here, where it was held: (Headnote 7) "A will directing a sale of testator's property 'according to the best judgment of the trustees' does not offend the rule against perpetuities, on the ground that the trustees may not determine to sell before 21 years after testator's death." See, also, *Shoemaker et al.* v. *Newman et al.,* 62 App. D. C. 120, 65 Fed. 2d 208, which is strikingly similar to the instant case and in point.

In our own case, *Morning Star Mining Company* v. *Bennett,* 164 Ark. 244, 261 S. W. 639, in considering the company's contract authorizing Miss Bennett to sell certain real estate of the company upon definite terms set out, the contract fixing no time limit on the agency, and it was sought to void the contract as offending against the rule of perpetuities, this court said: "We think the contract here sought to be canceled and upon which Miss Bennett bases her cross-complaint is not void as creating a perpetuity. It is not a grant of lands, and does not vest any interest therein in Miss Bennett, but, even if it did, that interest could not have extended beyond her lifetime. *Cribbs* v. *Walker,* 74 Ark. 104, 85 S. W. 244. However, we think the contract is a simple contract of agency, in which no time limit is fixed for performance of the contract, and it will therefore be construed as one granting her a reasonable time only in which to effect a sale of the property. At § 28 of the chapter on Perpetuities in 21 R. C. L., p. 303, it is said: 'Nor is a contract placing one's property in another's hands to manage and sell void as in violation of the rule against perpetuities because it contains no limitation upon the duration of the contract,

since the donee must proceed under the contract within a reasonable time, and his authority will terminate with his death.'" The principles of law above announced apply with equal force here. It appears, therefore, that the rule against perpetuities has no effect here, and it is the duty of the trustee in the instant case to make distribution of the estate as directed and "as soon as possible."

We come now to consider the third assignment. As above noted, a large number of U. S. Government bonds, totalling approximately $23,100, were found in the testatrix's lockbox. Each of these bonds was issued as follows: "To Mrs. Cecilia Hickey payable on death to"— a named beneficiary. It is our view in the circumstances here, and we so hold, that all of these bonds, with the exception of all those wherein the named beneficiary predeceased the testatrix, became the absolute property of the said beneficiary named, immediately upon the testatrix's death, without regard to the provisions of Mrs. Hickey's will.

The power of the Federal Government to issue United States savings bonds and to promulgate regulations governing their ownership, transfer and payment, is, we think, unquestioned. Article I, § 8, Cl. 2, of the Constitution of the United States, provides: "The Congress shall have Power . . . to borrow money on the credit of the United States." (Clause 18) "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," and Art. VI, Cl. 2, provides: "This Constitution, and the Laws of the United States which shall be made in pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Congress of the United States in the exercise of its constitutional power above conferred, enacted § 22 of the Second Liberty Bond Act, as amended, which provides: "The Secretary of the Treasury, with the ap-

proval of the President, is authorized to issue, from time to time, through the Postal Service, or otherwise, bonds of the United States to be known as 'United States Savings Bonds.' The proceeds of the Savings Bonds shall be available to meet any public expenditures authorized by law and to retire an outstanding obligation of the United States bearing interest or issued on a discount basis. The various issues and series of the Savings Bonds shall be in such forms, shall be offered in such amounts within the limits of § 752 of this title and shall be issued in such manner and subject to such terms and conditions consistent with subsections (b) and (c) hereof, and including any restrictions on their transfer, as the Secretary of the Treasury may from time to time prescribe." (Act of Sept. 24, 1917, ch. 56, § 22, as amended by · Act of Feb. 4, 1935, ch. 5, § 6; 49 Stat. 21; 31 U. S. C. A., § 757 c.)

Acting upon the authority thus conferred by this legislation, the Secretary of the Treasury issued regulations governing the issuance, transfer, ownership and payment of United States Savings Bonds. Those regulations pertinent here, are as follows: (Circular No. 530, Fourth Revision "Section 315.1: These regulations apply generally to all United States Savings Bonds of all series whatever and bearing any issue dates whatever except as otherwise specifically provided herein." "Section 315.2 (c) . . . The following forms of registration are authorized: (1) In the name of natural persons (that is individuals), whether adults or minors in their own right as follows: . . . (iii) In the name of one (but not more than one) person payable on death to one (but not more than one) other person, for example, 'John A. Jones, payable on death to Miss Mary E. Jones'; the first person named is hereinafter referred to as the owner or registered owner and the second named as the beneficiary or designated beneficiary.

"Section 315.3. United States Savings Bonds are not transferable and are payable only to the owners named thereon except in the case of the disability or death of the owner or as otherwise specifically provided

herein, but in any event only in accordance with the provisions hereof. . . . Section 315.12. Beneficiaries: (a) Payment to registered owner.—A savings bond registered in the name of one person, payable on death to a designated beneficiary, for example, 'Henry W. Ash, payable on death to John C. Black,' will be paid to the registered owner during his lifetime upon his properly executed request without regard to the designated beneficiary. If the beneficiary should predecease the registered owner the bond will be paid as though no beneficiary had been named in the registration. . . . (c) Payment or reissue to beneficiary.—If the registered owner dies without having presented and surrendered the bond for payment to a Federal Reserve Bank or the Treasury Department, and is survived by the beneficiary, upon proof of such death and survivorship, the beneficiary will be recognized by the Treasury Department as the sole and absolute owner of the bond, and payment will be made only to him, . . ."

It thus appears by the specific language of the regulations, *supra,* that the surviving designated beneficiary, in the circumstances here, in each of these bonds becomes "the sole and absolute owner of the bond," upon the death of the testatrix, and the United States, as obligor on the bond, will recognize no other owner and "payment will be made only to him." The surviving said beneficiary may demand the proceeds of the bond immediately upon the death of the testatrix.

The power given to the Secretary of the Treasury by Congress to make the regulations, *supra,* and to issue and transfer United States Government Bonds was properly delegated and exercised because the regulations were reasonably adapted to the execution of the legislative purpose. In *J. W. Hampton, Jr., & Company* v. *United States,* 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624, the court said: "The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the Executive Branch, within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion

in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations. *United States* v. *Grimaud*, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; *Union Bridge Co.* v. *United States*, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; *Buttfield* v. *Stranahan*, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; *In re Kollock*, 165 U. S. 526, 17 S. Ct. 444, 41 L. Ed. 813; *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 29 S. Ct. 671, 53 L. Ed. 1013.''

These Treasury regulations here involved not being in excess of the power conferred by Congress have the same force and effect as federal law and are controlling over any State law that may be in conflict. The Supreme Court of the United States in *Farmers & Mechanics Sav. Bank* v. *Minnesota*, 232 U. S. 516, 34 S. Ct. 354, 58 L. Ed. 706, referring to the decision in *McCulloch* v. *Maryland*, 4 Wheat. 316, 4 L. Ed. 579, said: ''The supremacy of the Federal Constitution and the laws made in pursuance thereof, and the entire independence of the General Government from any control by the respective States, were the fundamental grounds of the decision. The principle has never since been departed from, and has often been reasserted and applied.'' (Citing cases.) See, also, *United States* v. *Dauphin Deposit Trust Company, etc., et al.*, 50 F. Supp. 73 (D. C. M. D. Pa., May 18, 1943), for authorities cited therein.

As to all bonds wherein the named beneficiary predeceased the testatrix, such bonds revert to the estate. The regulations, *supra*, so provide ''if the beneficiary should predecease the registered owner the bond will be paid as though no beneficiary had been named in the registration.''

We conclude, therefore, that each and all of the beneficiaries named in the bonds in question who survived the testatrix became the absolute owners of such bonds immediately upon the testatrix's death and that any legacy under the will to any of these bondholders is in addition to such bond and unaffected by it.

Accordingly the decree is reversed, to the extent herein indicated, and the cause remanded with directions to modify the decree in accordance with this opinion. In all other respects the decree is affirmed.